## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DIANNA JOHNSON, *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | **Civil Action No. 02-2364 (RMC)** |
| ) | |
| GOVERNMENT OF THE DISTRICT ) | |
| OF COLUMBIA, *et al.*, ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION

It is alleged that the United States Marshal for the Superior Court of the District of Columbia directed a blanket policy and/or practice whereby all female arrestees—but not male arrestees—were subjected to "drop, squat and cough" strip searches before presentment to a judicial official. Approximately 16,000 women who were arrested for non-drug and non-violent offenses, such as traffic stops and other minor offenses, between December 2, 1999, and April 25, 2003, complain here that this blanket policy and/or practice violated their rights to be free from unreasonable searches under the Fourth Amendment and their rights to equal protection under the Fifth Amendment to the Constitution. Former Superior Court Marshal Todd Dillard, sued here in his individual capacity, asserts that his official search policy for the D.C. Superior Court cellblock was gender neutral; that he intended the policy to apply identically to both male and female arrestees; that he was unaware if his policy were being contravened by those conducting the searches; and that, in any event, he is entitled to qualified immunity.

In other litigation, the United States Marshals Service formally conceded that the

practice at the Superior Court cellblock in 2000 and 2001 was to subject all female arrestees to a blanket drop, squat and cough search while male arrestees underwent the same search only upon individualized suspicion. Former Marshal Dillard disputes the accuracy of this concession. The search practices at the Superior Court during the class period are very much contested. However, in light of the government's past formal admissions and record evidence in *Clifton v. U.S.*, No. 02-0578 (D.D.C. filed Mar. 26, 2002) and *Helton v. U.S.*, No. 01-0385 (D.D.C. filed Feb. 20, 2001), which similarly involved strip searches at the D.C. Superior Court cellblock, and the record before this Court, it is evident that during the class period female arrestees were subjected to a blanket practice of strip searches while many, if not most, male arrestees were not. Nonetheless, it is now clear that former Marshal Dillard is entitled to qualified immunity from the Fourth Amendment claims. The Fifth Amendment claims similarly fail as Plaintiffs proffer no evidence that former Marshal Dillard purposefully discriminated by intending a gender disparity in search procedures.

## I. FACTS

### A. The Searches

Plaintiffs complain of strip searches ("strip, visual body cavity and/or squat searches") to which they were subjected at the District of Columbia Superior Court cellblock while waiting for presentment before a judge or other judicial officer. Second Am. Compl. [Dkt. # 117] ¶ 1. Similar strip searches were complained of in *Clifton v. U.S.* and *Helton v. U.S.*, both of which settled with entry of a court order and injunction. Defendant Todd Dillard was the United States Marshal for the Superior Court of the District of Columbia from approximately October 1990 to 2004, and, accordingly, the Superior Court Marshal for the periods covered by both *Clifton* and *Helton* and the entirety of the Fourth and Fifth Amendment class period, which runs from December 1999 to April

2003.

As described by the United States Marshals Service (the "Service"), in 2001 all prisoners brought to the Superior Court cellblock first passed through a magnetometer and then underwent an "in-custody search," whereby they removed the contents of their pockets, had their outer clothing inspected, removed their shoes, and were thoroughly patted down. *See* Pls.' Mem. in Supp. of Mot. for Partial Summ. J. [Dkt. # 233], [Attach. 82] Marshal Service Interrog. Resp. in *Clifton v. U.S.* ¶ 8. After the "in-custody search," male detainees were then placed in a cell unless a detainee presented individualized suspicion that he had contraband on his person or posed other risk, in which event he was held aside to be subjected to "a more thorough search." *Id.*

However, as the Service described the strip search practice that existed in 2001, it was markedly different for female detainees:

> After the in-custody search, female detainees are then moved to an enclosed area separate and apart from male detainees. Only female detainees or officers are allowed in this area; no male detainees or officers may inadvertently or casually look into the area; and there are no closed-circuit televisions or other video recording devices present. One further step is required for female detainees since the pat-down search cannot reasonably ascertain whether there are weapons or contraband secreted in the brassiere or the vagina.

> The female detainee herself is asked to grasp her brassiere through her outer clothing and move it or shake it in a manner designed to dislodge any weapon or contraband that may be hidden there. The detainee is then asked to face a wall, lower her pants and underwear, and "squat and cough". The detainee squats by lowering her body from an upright standing position until her upper legs are parallel to the floor. A female [officer] observes this procedure, which lasts 2 to 3 seconds, from a distance of about 10 feet from the detainee. At no time does the female [officer] closely view any detainee's orifices.

> Female detainees are subjected to this final step primarily because of the history of discovery of contraband and weapons hidden in the

-3-

vagina of women who arrive in the United States Marshals Service's cellblock from the District of Columbia jail or the District of Columbia Metropolitan Police Department, and because of the relative ease with which contraband or weapons can be secreted in the vagina or sanitary napkins.

*Id*. (describing practice that existed on June 29, 2001); *see also* Pls.' Mem., [Attach. 73] Marshal Service Interrog. Resp. in *Helton v. U.S.* ¶ 8 (describing identical practice being in existence on February 21, 2000); Second Am. Compl. ¶¶ 133–35 (detailing the complained of drop, squat and cough searches). Thus, when sued in separate suits in 2001 and 2002, the Service formally admitted through sworn interrogatory responses that the Superior Court Marshal had a blanket practice of drop, squat and cough searches of all female prisoners, but not of male prisoners without individualized suspicion.

This case did not proceed immediately because, on April 25, 2003, the parties agreed to a temporary standstill to pursue settlement discussions and the Service vowed,

in response to the injunctive relief claims contained in the complaint herein and plaintiffs' motion for a preliminary injunction, the Federal Defendants will have implemented by Monday, April 28, 2003, new security policies and practices that will (i) permit "drop, squat and cough" searches or a strip search only, at the least, upon an individualized finding of reasonable suspicion, if not probable cause, and with the approval of a supervisor; and (ii) insure that such searches will be applied even-handedly to both men and women arrestees and detainees.

*See* Consent Mot. to Hold Mots. in Abeyance Pending Settlement Discussions [Dkt. # 24] at 2. Despite *Clifton* and *Helton*, Marshal Dillard insists that he had a blanket policy at the Superior Court throughout the class period of subjecting all arrestees, regardless of gender, to drop, squat and cough searches. *See* Def.'s Notice of Dep. Excerpts [Dkt. # 240] ("Dep. Excerpts"), [Attach. 9] Todd

Dillard Dep. (Nov. 20, 2009) at 92–93, 96–98; *see also id*., [Attach. 14] Thomas Hedgepeth Dep. (July 17, 2007) at 220–23 (corroborating that official policy throughout class period was that all prisoners were to be drop, squat and cough searched). Following voluminous discovery, the record reveals that the practice employed by Superior Court employees in conducting strip searches was not gender neutral.[1] Were just the practice itself at issue, Marshal Dillard's current testimony would need to be evaluated by a jury, since it is irreconcilably at odds with the Service's prior sworn responses and the instant record. However, in light of recent D.C. Circuit case law, the Court must conclude that Marshal Dillard enjoys qualified immunity from Plaintiffs' Fourth Amendment claims and that, without evidence that Marshal Dillard himself acted with discriminatory purpose by subjecting male and female arrestees to different strip search procedures, the Fifth Amendment claims must also be dismissed.

### B. Procedural History

This lawsuit was initially brought against the District of Columbia, the United States Marshals Service, former Superior Court Marshal Todd Dillard in his individual capacity, and various John Doe deputy Marshals. The parties spent the time between April 2003 and April 2006 attempting to settle. When those efforts failed, Plaintiffs filed a First Amended Complaint on April 28, 2006. *See* First Am. Compl. [Dkt. # 58]. On November 14, 2006, the Court denied defense motions to dismiss and found that Marshal Dillard was not entitled to qualified immunity on the Fourth and Fifth Amendment constitutional claims. *See* Order Denying Defs.' Mots. to Dismiss

---

[1] Several Deputy Marshals testified that they did not consider a drop, squat and cough search to be a "strip search" since the arrestee did not become completely nude in the search; a woman kept her shirt on, albeit pulled up, and only had to drop her pants and underwear low enough to allow her to squat and cough. In this Opinion, as in the briefs and prior cases, the terms "strip search" and "drop, squat and cough search" are used interchangeably.

[Dkt. # 81] at 3.

Plaintiffs filed a Second Amended Complaint on May 24, 2007. *See* Second Am. Compl. Plaintiffs abandoned their claims against the various John Doe Deputy Marshals in the Second Amended Complaint but added claims against Marshal Dillard in his official capacity. *See id.* In 2008, the Court certified separate Fourth and Fifth Amendment classes and dismissed the Service as a defendant, finding that Plaintiffs lacked standing to seek equitable relief from it. *See* Mem. Op. & Order [Dkts. ## 158, 159]. The Court also denied Plaintiffs' request to certify an alternative Fourth Amendment class which would have included both male and female arrestees. *See id.* In 2008, the Court dismissed the District of Columbia, finding that it could not be liable to Plaintiffs under 42 U.S.C. §§ 1983 and 1988 because Marshal Dillard was a federal official acting under the color of federal law. *See* Mem. Op. & Order [Dkts. ## 202, 203]. In 2010, the Court denied Plaintiffs' motion for leave to file a Third Amended Complaint. *See* Order [Dkt. # 226].

On April 5, 2010, following extensive discovery, Plaintiffs moved for partial summary judgment, *see* Pls.' Mot. [Dkt. # 233], and Marshal Dillard cross-moved for judgment on the pleadings, or in the alternative, for summary judgment. *See* Def.'s Mot. for Summ. J. [Dkt. # 232]. Oral argument was heard on September 24, 2010, and October 28, 2010. At oral argument on September 24, 2010, the Court reaffirmed its finding that Marshal Dillard had acted under color of federal law as the United States Marshal for the Superior Court of the District of Columbia for the same reasons outlined in its prior Order, *see* Mem. Op. & Order [Dkts. ## 202, 203], and dismissed all claims under 42 U.S.C. §§ 1983 and 1988 against Marshal Dillard. Thus, remaining before the Court are claims against Marshal Dillard in his personal capacity alone for alleged violations of Plaintiffs' Fourth and Fifth Amendment rights.

## II.  LEGAL STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgement as a matter of law."  Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Anderson*, 477 U.S. at 247–48.  Moreover, summary judgment is properly granted against a party who "after adequate time for discovery and upon motion . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

In ruling on a motion for summary judgment, the court must draw all justifiable inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true. *Anderson*, 477 U.S. at 255.  A nonmoving party, however, must establish more than "the mere existence of a scintilla of evidence" in support of its position.  *Id.* at 252.  In addition, the nonmoving party may not rely solely on allegations or conclusory statements.  *See Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).  Rather, the nonmoving party must present specific facts that would enable a reasonable jury to find in its favor.  *Id.* at 675.  If the evidence "is merely colorable, or is not significantly probative, summary judgment may be granted."  *Anderson*, 477 U.S. at 249–50 (citations omitted); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (noting that when a movant has satisfied his burden under Rule 56, the "opponent must do more than simply show that there is some metaphysical doubt as to the material facts").

# III. ANALYSIS

## A. Fourth Amendment Claims

The Fourth Amendment Class consists of :

> Each woman who, during the Class Period (December 2,
> 1999, until April 25, 2003), was, (I) held in the Superior
> Court Cell Block; (ii) awaiting presentment under a statute
> of the District of Columbia on either (a) a non-drug, non-
> violent traffic offense; (b) a non-drug, non-violent
> misdemeanor; or © a non-drug, non-violent felony; and
> (iii) subjected to a blanket strip, visual body cavity and/or
> squat search; (iv) without any individualized finding of
> reasonable suspicion or probable cause that she was
> concealing drugs, weapons or other contraband.

*See* Order Certifying Class [Dkt. # 159] at 1. Following arrest, these women were brought to the

Superior Court cellblock from any of the seven Metropolitan Police Department ("MPD") stations,

substations, traffic stations, or MPD's central cellblock for presentment before a judicial officer. The

women were arrested by MPD, the Capitol Police, the Park Police, or any of the myriad of law

enforcement entities that have authority to arrest in the District of Columbia. Typically, if a person

were arrested before three p.m., she would be brought to the Superior Court cellblock the same day;

if she were arrested after three p.m., she would generally be taken to the MPD central cellblock to

spend the night and would be brought to the Superior Court cellblock early the following morning.

Arrestees were typically searched a few times before being brought to the Superior

Court—usually by the arresting officer/s at the scene of arrest, again at the MPD district station, and

then again before being placed on a van to be transported by MPD to the Superior Court cellblock.

These searches were generally pat-downs. Arrestees were brought to the Superior Court cellblock

where they would be held until their presentment to a judicial officer. Also temporarily in custody

at the Superior Court cellblock awaiting a court hearing would have been convicted prisoners and pre-trial criminal defendants transported from Lorton Correctional Center (which closed in 2001), the D.C. Jail, or the Correctional Treatment Facility (collectively the "jail cases"). Female arrestees and female jail cases were held in separate cells and were not co-mingled. Plaintiffs' Fourth and Fifth Amendment classes are made up exclusively of female arrestees, not female jail cases.

Arrestees in the Superior Court cellblock were searched primarily by Detention Enforcement Officers ("DEOs") and, to a slightly lesser extent, Deputy Marshals ("deputies"). Supervisors would intermittently assist in the searches if necessary. Arrestees brought into the cellblock would typically pass through a magnetometer and undergo a thorough pat-down search before (or after) being placed in the search room designated for their gender. Although pat-downs or lesser-degree searches could occur in the hallways or more public areas of the cellblock, female arrestees were subjected to drop, squat and cough searches only in the female search room. There is no allegation that a male was ever present during any of the female drop, squat and cough searches.

The Superior Court cellblock was for temporary custody only; if arrestees were not released by a judicial officer directly from the courtroom after presentment, they would be transferred to the D.C. Jail, where further body searches would occur. Jail cases stayed in the cellblock only as needed for their court hearings and were transferred back from whence they came by day's end. No arrestee or jail case remained in the Superior Court cellblock overnight. While the exact statistics over the entirety of the class period were not maintained and are contested by Marshal Dillard, it appears that a significant portion, if not the majority, of female arrestees were typically released from custody immediately from the courtroom in which they were arraigned,

without having to return to the cellblock.

During the entirety of the class period, the standard under which body searches were to be conducted was officially governed by U.S. Marshals Service Policy Directive 99-25. Policy Directive 99-25 was issued Service-wide to "All U.S. Marshals Employees," with a cover memo dated July 15, 1999. *See* Def.'s Mem. in Supp. of Mot. for Summ. J. [Dkt. # 232], [Attach. 2] Policy Directive 99-25. The purpose of the directive was to provide "specific instructions to U.S. Marshals Service (USMS) employees for determining if, and under what conditions, body searches are legally permissible and how they will be conducted." *Id*. at I. Policy Directive 99-25 was gender neutral and laid out various factors an officer could consider in determining whether reasonable suspicion existed that a prisoner were carrying contraband or presented other risk (i.e. security, escape, suicide) to justify a strip search. *Id*. at IV(C)(1). Among the factors to be considered were the history of discovery of contraband on an individual prisoner or in a particular institution, and the type and security level of the particular institution in which the prisoner was held. *See id*. Policy Directive 99-25 was in effect from July 15, 1999 to October 6, 2003.

Marshal Dillard asserts that the Superior Court search policy in place throughout the class period was that every prisoner, both male and female, arrestee and jail case, was to be subjected to a blanket strip search. *See* Dillard Dep. at 92–93, 96–98. The record reveals that during the class period the day-to-day practice at the cellblock mirrored Marshal Dillard's asserted policy only as to female arrestees, who were, in fact, all subjected to drop, squat and cough searches.[2]

_____

[2] Approximately fourteen female DEOs and deputies who conducted strip searches of female arrestees at the Superior Court cellblock were deposed and uniformly testified that during the class period the practice was to subject every female arrestee to a drop, squat and cough search. *See e,g.,* Pls.' Mem., [Attach. 29] Michelle Alexander Dep. (Aug. 28, 2007) at 35–38, 45–46 (searches from approximately February 2002 to March 2003); *id*., [Attach. 70] Jacqueline Hargrove Dep. from

Plaintiffs first allege that the blanket drop, squat and cough searches were unreasonable for women arrested for non-drug and non-violent offenses and, therefore, violative of the Fourth Amendment.[3] Plaintiffs sue Marshal Dillard in his personal capacity for these alleged violations. A plaintiff may bring a claim for money damages against a federal official in his individual capacity for a violation of the plaintiff's constitutional rights. *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388, 389 (1971). A federal agency is not a proper defendant under *Bivens*. *See FDIC v. Meyer*, 510 U.S. 471, 484–86 (1994); *Gabriel v. Corrections Corp. of America*, 211 F. Supp. 2d 132, 137 n.7 (D.D.C. 2003). Marshal Dillard moves for summary judgment that the blanket policy of conducting drop, squat and cough searches on arrestees entering the Superior Court cellblock did not violate the Fourth Amendment and that, in any event, he is entitled to qualified immunity.[4]

---

*Clifton v. U.S.* (Sept. 18, 2002) at 8–9 (approximately 1995 to September 2002); *id.*, [Attach. 49] Penelope Knox Dep. (Oct. 5, 2009) at 22–26 (approximately October 2000 to 2004); *id.*, [Attach. 58] Debora Seifert Dep. (Aug. 28, 2009) at 67–69 (approximately August 1998 to August 2001); *but see* Dep. Excerpts, [Attach. 5] Tracy Bryce Dep. (Aug. 16, 2007) at 75–77 (testifying that she believed the blanket drop, squat and cough searches of female arrestees ended around 2000). Marshal Dillard concedes this point, but points to a Fourth Amendment class representative who could not recall whether she received a drop, squat and cough search for both of her arrests, rather than for just one. *See* Def.'s Mem. at 29. The class representative did not testify affirmatively that she was not strip searched both times, and it is unclear whether both of her arrests occurred during the class period. *See* Pls.' Reply [Dkt. # 251] at 2. This possible incident does not negate the consistent practice revealed by the overwhelming testimony.

[3] Plaintiffs moved to amend their Complaint to add a claim that the non-private setting in which the female arrestees were made to drop, squat and cough—in a female search room in front of other female arrestees—was an unreasonable time, place, and/or manner in which to conduct the searches under the Fourth Amendment. The Court denied Plaintiffs' request. *See* Order [Dkt. # 226].

[4] Marshal Dillard also moves for dismissal of all claims by Plaintiff Donna Curtis for failure to prosecute, as she failed to attend a scheduled deposition, and to dismiss Plaintiffs Dianna Johnson and Carolyn Montgomery, for whom a suggestion of death has been filed. *See* Def.'s Mem. at

On November 14, 2006, in denying the various defendants' motions to dismiss, this

Court agreed with Plaintiffs that, if the facts proved to be as alleged, a violation of the Fourth and

Fifth Amendments would be shown and Marshal Dillard was not entitled to qualified immunity.

> Here, the First Amended Complaint alleges that U.S.
> Marshals – at the direction of and pursuant to a policy
> developed by former Marshal Dillard – subjected [female
> arrestees] to blanket strip searches and visual cavity searches
> without a reasonable individualized suspicion that [they]
> were concealing weapons or contraband. . . . [and that] all
> female arrestees at the D.C. Superior Court were subjected
> to blanket strip searches, but similarly situated male
> arrestees were not strip searched. These allegations, if true,
> adequately allege violations of the Fourth and Fifth
> Amendments.

Order Denying Defs.' Mots. to Dismiss [Dkt. # 81] at 2–3.

In 2006, when the Court decided that Plaintiffs had adequately alleged unreasonable

---

40–42; *see also* Suggestion of Death [Dkt. # 215]. Plaintiffs do not oppose dismissal if it is without prejudice. *See* Pls.' Supplemental Opp'n [Dkt. # 244] at 2. Accordingly, Plaintiffs Donna Curtis, Dianna Johnson, and Carolyn Montgomery will be dismissed without prejudice.

In addition, Marshal Dillard moves to dismiss Plaintiff Rabbiyah Muhammad for failure to prosecute because of her failure to submit timely sworn interrogatory responses, or as a sanction for the same. It is alleged that Ms. Muhammad submitted unsigned interrogatory responses and at her deposition denied that she had ever seen the unsworn responses attributed to her. Def.'s Mem. at 42. Her sworn responses were not received until after her deposition. Marshal Dillard argues prejudice because he "was unable to fully address the inconsistencies between the interrogatory responses and Ms. Muhammad's testimony during her deposition, and thus was deprived of the opportunity to impeach Ms. Muhammad with contradictory sworn testimony." Def.'s Reply [Dkt. # 250] at 44. Based on counsels' arguments, it appears that any untimeliness on Ms. Muhammad's part was mere inadvertence, and not sufficiently delayed or negligent as to warrant dismissal for failure to prosecute. Adjudication of claims on the merits is preferable and "'dismissal is a sanction of last resort to be applied only after less dire alternatives have been explored without success' or would obviously prove futile." *Shea v. Donohoe Constr. Co.*, 795 F.2d 1071, 1075 (D.C. Cir. 1986) (quoting *Trakas v. Quality Brands, Inc.,* 759 F.2d 185, 186–87 (D.C. Cir. 1985)). Marshal Dillard has not been prejudiced "so severely" as to warrant the drastic sanction of dismissing Ms. Muhammad. *See Shea*, 795 F.2d at 1074. The motion to dismiss Rabbiyah Muhammad will be denied.

searches under the Fourth Amendment, ten of twelve U.S. Courts of Appeals[5] had ruled, with only insignificant differences, that the blanket strip search of pretrial detainees, arrested for minor offenses and lacking any individualized suspicion, violated the Fourth Amendment.[6]   In 2006, however, the D.C. Circuit had not yet spoken to the question.   The ten circuits that had found such searches to violate the Fourth Amendment were interpreting and applying *Bell v. Wolfish*, 441 U.S. 520 (1979), which established a balancing test to determine when a strip search in the context of detention is valid under the Fourth Amendment.   *Bell* considered a challenge to a Bureau of Prisons' policy at the Metropolitan Correctional Center in New York City, whereby every federal detainee was required to undergo a visual body-cavity strip search following any contact visit with an outsider.   *Bell*, 441 U.S. at 558.   After acknowledging a body cavity search "instinctively gives us the most pause," *id*. at 558, the Supreme Court explained, "we deal here with the question whether visual body-cavity inspections as contemplated by the [Metropolitan Correctional Center] rules can *ever* be conducted on less than probable cause.   Balancing the significant and legitimate security interests of the institution against the privacy interests of the inmates, we conclude that they can." *Id*. at 560.

   Since this Court's ruling in 2006, two circuits have re-visited their prior

---

[5] Excluding the U.S. Court of Appeals for the Federal Circuit.

[6] *See, e.g., Roberts v. Rhode Island*, 239 F.3d 107, 110 (1st Cir. 2001); *Weber v. Dell*, 804 F.2d 796, 802 (2d Cir. 1986); *Logan v. Shealy*, 660 F.2d 1007, 1013 (4th Cir. 1981); *Stewart v. Lubbock County*, 767 F.2d 153, 156–57 (5th Cir. 1985); *Masters v. Crouch*, 872 F.2d 1248, 1255 (6th Cir. 1989); *Mary Beth G. v. Chicago*, 723 F.2d 1263, 1273 (7th Cir. 1983); *Jones v. Edwards*, 770 F.2d 739, 741–42 (8th Cir. 1985); *Giles v. Ackerman*, 746 F.2d 614, 618 (9th Cir. 1984), *overruled on other grounds by Hodgers-Durgin v. De La Vina*, 199 F.3d 1037, 1040 n.1 (9th Cir. 1999); *Hill v. Bogans*, 735 F.2d 391, 394 (10th Cir. 1984); *Wilson v. Jones*, 251 F.3d 1340, 1343 (11th Cir. 2001).

interpretations of *Bell v. Wolfish*. Marshal Dillard holds up *Powell v. Barrett*, 541 F.3d 1298 (11th Cir. 2008) (en banc) and *Bull v. City and County of San Francisco*, 595 F.3d 964 (9th Cir. 2010) (en banc). In *Powell*, the Eleventh Circuit reversed course and determined that the Fourth Amendment, under its revised interpretation of *Bell*, does not preclude a policy or practice "of strip searching all arrestees as part of the process of booking them into the general population of a detention facility, even without reasonable suspicion." *Powell*, 541 F.3d at 1300. Likewise, the Ninth Circuit reversed its earlier interpretation of *Bell* and held that a policy "requiring strip searches of all arrestees classified for custodial housing in the general population was facially reasonable under the Fourth Amendment, notwithstanding the lack of individualized suspicion as to the individuals searched." *Bull*, 595 F.3d at 982. After the parties filed briefs in this matter, the Third Circuit weighed in for the first time and similarly found the blanket strip search of arrestees prior to introduction into a general jail population did not violate the Fourth Amendment. *See Florence v. Bd. of Chosen Freeholders*, 621 F.3d 296 (3d. Cir. 2010).[7]

Marshal Dillard argues that these new decisions illustrate that the challenged search practice at the Superior Court perfectly accorded with *Bell v. Wolfish* and did not violate the Fourth Amendment, and/or that he reasonably could not have known that such searches violated the Constitution. For reasons described below, the Court bypasses the question of whether Marshal

---

[7] *But see Jimenez v. Wood County*, 621 F.3d 372, 375 (5th Cir. 2010) (rejecting request that the circuit revisit its earlier interpretation of *Bell v. Wolfish* in light of *Bull* and *Powell* and reaffirming Fifth Circuit precedent that "a strip search of an individual arrested for a minor offense must be premised on reasonable suspicion that the detainee is carrying weapons or contraband"); *Stearns v. Clarkson*, 615 F.3d 1278, 1282 (10th Cir. 2010) (finding official not entitled to qualified immunity because under Tenth Circuit precedent "it is also clearly established that 'a detainee who is not placed in the general prison population cannot be strip searched if the searching officer does not at least have reasonable suspicion that the detainee possesses concealed weapons, drugs, or contraband'") (quoting *Archuleta v. Wagner*, 523 F.3d 1278, 1286 (10th Cir. 2008)).

Dillard violated Plaintiffs' Fourth Amendment rights, addressing instead his right to qualified immunity, even assuming all of Plaintiffs' allegations are true.

Qualified immunity is "a defense that shields officials from suit if their conduct 'd[id] not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Ortiz v. Jordan*, 131 S. Ct. 884, 888 (2011) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "In developing the doctrine of qualified immunity, the Supreme Court has sought to strike a balance 'between the interests in vindication of citizens' constitutional rights and in public officials' effective performance of their duties.'" *Int'l Action Ctr. v. United States*, 365 F.3d 20, 24 (D.C. Cir. 2004) (quoting *Anderson v. Creighton*, 483 U.S. 635, 639 (1987)). A federal official can be liable individually but "that official must have violated a constitutional right, *and* that right must have been 'clearly established' – 'the contours of the right must be sufficiently clear that a reasonable official would understand what he is doing violates that right.'" *Id.* (quoting *Anderson*, 483 U.S. at 640).

Traditionally, looking at the facts alleged in a light most favorable to the plaintiff, a court would first decide whether "the facts alleged show the officer's conduct violated a constitutional right," and, only if so, "whether that right was clearly established" at the time of the violation. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). The Supreme Court has since instructed that a court can employ its discretion to decide in which sequence to address these two inquiries. *Pearson v. Callahan*, 129 S. Ct. 808, 818 (2009). Because the D.C. Circuit has very recently made "plain that a constitutional right" as alleged by Plaintiffs "is not clearly established," *id.*, it is prudent for this Court to proceed directly to qualified immunity.

On March 25, 2011, the District of Columbia Circuit issued a decision directly on

point. *See Bame v. Dillard*, No. 9-5330, 2011 U.S. App. LEXIS 6207 (D.C. Cir. Mar. 25, 2011 *as amended* Mar. 31, 2011). The *Bame* plaintiffs, all males, had filed a class action against Marshal Dillard for strip searches, including drop, squat and cough searches, conducted in 2002 following mass arrests of peaceful protesters. Plaintiffs argued they were unconstitutionally searched and that Marshal Dillard was not entitled to qualified immunity as the unanimity in the circuits in 2002 made clear that the Fourth Amendment "prohibited strip searching a person arrested for a non-violent, non-drug-related misdemeanor absent a particularized reason to suspect the arrestee was concealing contraband or weapons about his person." *Id*. at *1–2. Under the principle of constitutional avoidance, the D.C. Circuit proceeded directly to the question of whether the constitutional right invoked by the plaintiffs was clearly established at the time of the searches. The Circuit noted: "'There are cases in which it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right.' This is such a case." *Id*. at *8 (quoting *Pearson*, 129 S. Ct. at 818).

The D.C. Circuit concluded that Marshal Dillard was entitled to qualified immunity in *Bame* because "the law in 2002 did not clearly establish that strip searching all male arrestees prior to placement in holding cells at the Superior Court violated the Fourth Amendment." *Id*. at *13. "The governing precedent was then, as it is now, *Bell v. Wolfish*, and nothing in *Bell* requires individualized, reasonable suspicion before strip searching a person entering a detention facility." *Id*. "To the contrary, as the Eleventh Circuit would later point out, 'The *Bell* decision means that the Fourth Amendment does not require reasonable suspicion for this type of strip search in detention facilities.'" *Id*. (quoting *Powell*, 541 F.3d at 1308).

The facts alleged by Plaintiffs are not sufficiently distinguishable from *Bame* to allow

-16-

a different result. The *Bame* plaintiffs contested blanket strip searches of non-violent, non-drug

related misdemeanor arrestees absent any individualized suspicion at the D.C. Superior Court

cellblock, *see id*. at *2–3, as do Plaintiffs here.[8] The D.C. Circuit explicitly dispatched with the

appellees' arguments—which Plaintiffs repeat here—that: (1) the law was clear in 2002 that this type

of search was unconstitutional because ten circuits had spoken unanimously to that effect; and (2)

Marshal Dillard should not be able to rely upon *Powell* or *Bull* or other circuit decisions not decided

until 2008 as evidence that the law was insufficiently clear in 2002. *See id*. at *10–13. "That *Powell*

and *Bull* came down after 2002 is of no moment; those opinions simply accord with our

understanding that *Bell* did not establish the unconstitutionality of a strip search under conditions

like those present here." *Id*. at *14.[9]

　　　　Plaintiffs' additional arguments fare no better. It is arguable that *Powell*, *Bull*, and

*Florence* are distinguishable from cases involving Superior Court arrestees, because the prisoners

before those circuits were about to be entered into, or co-mingled with, a general jail or detention

facility population and most Plaintiffs here were only held temporarily at the D.C. Superior Court

and then either released from the courtroom the same day or transferred to the D.C. Jail, a true

---

[8] The Fourth Amendment class here includes women arrested for non-drug, non-violent traffic offenses, misdemeanors, and/or felonies, and while the *Bame* decision spoke of those arrested for non-violent, non-drug related misdemeanor offenses, its holding did not hinge on the type of violation or crime for which a plaintiff was arrested, but extended to all persons being introduced into the D.C. Superior Court cellblock, found by the D.C. Circuit to constitute a "detention facility." *See id*. at *13.

[9] *But see id*. at *42 (Rogers, J., dissenting) ("Marshal Dillard's reliance on post-2002 decisions is doubly flawed. Under Supreme Court qualified immunity precedent, circuit court of appeals decisions since the strip searches at issue in 2002 have no bearing on whether he is entitled to qualified immunity on the ground that there was no clearly established law to be followed in 2002. But taken on their own merit the post-2002 cases are distinguishable on their facts and do not demonstrate that the law was unsettled in 2002, much less after.") (citations omitted).

"detention" facility in Plaintiffs' rubric.  This very argument was rejected in *Bame*.  The D.C. Circuit found the "Court's rationale in *Bell* applies equally to any detention facility that is 'fraught with serious security dangers,' as was the cellblock at the Superior Court, where often hundreds of arrestees were processed in a single day."  *Id*. at *17 (quoting *Bell*, 441 U.S. at 559).  "Contrary to the plaintiffs' contention, nothing whatsoever in *Bell* suggests its holding is limited to overnight detention facilities. . . . [n]or . . . did the Court in *Bell* anywhere mention, let alone rely upon, such intermingling as a reason for upholding the strip searches."  *Id*.  "In any event, arrestees held at the Superior Court were in fact commingled with other arrestees in holding cells; no one suggests each arrestee was put in a separate cell."  *Id*. at *17–18.

The D.C. Circuit has spoken unequivocally.  Even assuming all facts alleged by the Fourth Amendment class as true, the claims addressed in *Bame* and the instant case cannot be distinguished in any meaningful way.  Obviously, the Court must reconsider and modify its prior ruling that Marshal Dillard is not entitled to qualified immunity on Plaintiffs' Fourth Amendment claims, *see* Order Denying Defs.' Mots. to Dismiss [Dkt. # 81], in light of the D.C. Circuit's decision.  Marshal Dillard is entitled to qualified immunity against the claims that he violated Plaintiffs' Fourth Amendment rights.  Accordingly, Plaintiffs' motion for summary judgment, which spoke solely to the Fourth Amendment claims, will be denied, and summary judgment will be entered for Marshal Dillard.

**B.  Fifth Amendment Claims**

The Fifth Amendment Class consists of:

> Each woman who, during the Class Period (December 2,
> 1999, until April 25, 2003), was, (I) held in the Superior
> Court Cell Block; (ii) awaiting presentment under a statute

of the District of Columbia; (iii) subjected to a blanket strip, visual body cavity and/or squat search; (iv) under similar circumstances for which male arrestees were not subjected to a blanket strip, visual body cavity and/or squat search.

*See* Order Certifying Class at 1. Plaintiffs argue that by no later than January 1999, "defendant Dillard had a policy and practice in place of requiring all female prisoners but not male prisoners to be subjected to blanket drop, squat, and cough searches." Pls.' Reply [Dkt. # 251] at 10. This gender-based practice is alleged to have violated Plaintiffs' rights to equal protection.[10] As noted above, significant evidence exists that both the policy and practice at the Superior Court cellblock during the class period was that every female arrestee was subjected to a blanket drop, squat and cough search. *See supra* note 2.

In contrast, ample evidence exists that, at least in practice, many DEOs and deputies did not subject male arrestees to a blanket drop, squat and cough search unless there were reasonable, individualized suspicion that the male arrestee was harboring contraband or presented other risk. *See, e.g.*, Pls.' Mem., [Attach. 57] Mark Shealey Dep. (May 8, 2007) at 157, 166–67 (testifying as to practice between January 1999 to summer of 2002 as the a.m. cellblock supervisor); *id.*, [Attach.

---

[10] The Fifth Amendment provides that "[no] person shall be . . . deprived of life, liberty, or property, without due process of law." U.S. CONST. amend. X. The equal protection clause of the Fourteenth Amendment does not apply to the District of Columbia, which is a political entity created by the federal government, but the due process clause of the Fifth Amendment has been held to impose the same equal protection restrictions on the federal government and D.C. as the Fourteenth Amendment does on the States. *Propert v. District of Columbia*, 948 F.2d 1327, 1330 n.5 (D.C. Cir. 1991) (citing *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954)); *Davis v. Passman*, 442 U.S. 228, 234 (1979). "To withstand scrutiny under the equal protection component of the Fifth Amendment's Due Process Clause, 'classifications by gender must serve important governmental objectives and must be substantially related to achievement of those objectives.'" *Davis*, 442 U.S. at 234–35 (quoting *Califano v. Webster*, 430 U.S. 313, 316–317 (1977)). "The equal protection component of the Due Process Clause thus confers on petitioner a federal constitutional right to be free from gender discrimination which cannot meet these requirements." *Id*. at 235–36.

41] Edward Eversman Dep. (Sept. 14, 2009) at 52–54, 72, 77–79, 82 (testifying that between February 1997 to June 2000, he never witnessed a blanket practice of strip searching male arrestees nor was he ever instructed by any superior to conduct such strip searches); *id*., [Attach. 30] Michael Artis Dep. (Aug. 16, 2007) at 97–102, 110–12 (explaining that during the class period male arrestees were only strip searched upon individualized suspicion and that out of thousands of male arrestees he had patted down, with the exception of a male juvenile, he could not recall one instance of strip searching a male arrestee); *id*., [Attach. 33] Robert Brandt Dep. (Jan. 6, 2009) at 53–54, 56, 73 (stating that from 1996 to 2004, he never saw a male arrestee strip searched without individualized suspicion nor did any supervisor ever tell him to strip search all male arrestees as a blanket policy); *id*., [Attach. 40] Mark Anthony Edge Dep. (Oct. 20, 2008) at 44–46 (same practice from 1989 to 2008); *id*., [Attach. 32] Ronald Erwin Bolls Dep. (Jan. 21, 2009) at 25–28, 30–31, 33–34, 37 (testifying as p.m. cellblock supervisor from September 2000 to January 2002 that male arrestees were not subject to a blanket practice of drop, squat and cough searches).

Just to confuse things, the record also contains vague and contradictory testimony that the standard under which a male arrestee might have been subjected to a drop, squat and cough search, i.e., blanket protocol or individualized suspicion, changed once or more during the class period. *See* Pls.' Mem., [Attach. 54] Gregory Petchel Dep. (Jan. 6, 2009) at 62–73 (testifying that, as supervisory deputy from 1996 to 2004, the initial practice was to strip search male arrestees only upon individualized suspicion; around 2001, the practice changed to strip searches of all male arrestees; that practice was stopped again, resumed again, and finally ended when the Office of General Counsel told the Marshal to cease around 2003); *id*., [Attach. 59] Jonathan Stover Dep. (Oct. 21, 2008) at 53–62 (testifying that he was not instructed to subject male arrestees to a blanket

practice of drop, squat and cough searches until around 2000, but the practice did not last long before it stopped again);[11] *id*., [Attach. 27] Clyde Afman Dep. (Nov. 10, 2009) at 26, 33–34, 45–49, 82 (explaining that from his start date in 1996 blanket strip searches were performed on every male arrestee but the practice was discontinued sometime between 1999 to 2001).

Without a fact-finder to make credibility determinations, it can only be said that there appear to have been great differences in search practices of male arrestees at the Superior Court cellblock under Marshal Dillard, an observation that stands in stark contrast to the uniformity with which female DEOs and deputies testified that *all* female arrestees were subjected to drop, squat and cough searches. Even if some DEOs or deputies conducted strip searches on male arrestees on occasion, it cannot be said that the record supports Marshal Dillard's testimony of a blanket practice at the Superior Court cellblock of drop, squat and cough strip searches of male arrestees.[12]

---

[11] Plaintiffs filed a Motion for Leave to Address Jonathan Stover's Testimony Offered in Defendant's Reply to Plaintiffs' Motion for Summary Judgment, *see* [Dkt. # 262], which in essence is a motion for leave to file a surreply. The Court allowed Defendant an opportunity to file a response to arguments raised in this motion. *See* Def.'s Consolidated Response [Dkts. ## 269, 270]. The motion [Dkt. # 262] will be granted.

[12] It would take a fact-finder to decipher the differences in testimony between Marshal Dillard—who says that he merely continued a pre-existing search policy when he became U.S. Marshal for the Superior Court; that his policy was consistent throughout the class period; that the managers and supervisors in the chain of command were to enforce his policies; that he discussed inconsistencies and problems arising at the Superior Court with his supervisors at a weekly meeting; and that he personally visited the male search rooms unannounced and at random times to ensure compliance with his policies and observed male arrestees subjected to drop, squat and cough searches, *see, e.g.,* Dillard Dep. at 50, 52–57, 72, 75–76, 90–92, 95–96, 98, 228; *see also id.* at 56 ("My instructions were that every supervisor was to constantly be aware of what is going on in the area that they were responsible for supervising. And the only way you could possibly do that is to eyeball it yourself periodically. I mean, you didn't have to stand there all day, of course, we had other duties. But you had to know – to know what was going on, you had to see what was going on."), and the sworn answers of the Service in *Clifton* and *Helton*, as well as the testimony of supervisory deputies, deputies, and DEOs that male arrestees were not subjected to a blanket practice of strip searches.

Marshal Dillard counters that "the evidence that Plaintiffs cite indicates that the search *practice* may have varied among male and female deputies and DEOs," Def.'s Reply [Dkt. # 250] at 25, but that his *policy* was clear and gender neutral. *See, e.g.*, Dillard Dep. 63–69, 92–93, 96–98. Marshal Dillard argues there is no evidence that he intentionally discriminated against Plaintiffs in violation of their constitutional rights and that he cannot be held liable under a theory of respondeat superior, even if any of his subordinates violated their rights. *See Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1948 (2009); *Simpkins v. District of Columbia Gov't*, 108 F.3d 366, 369 (D.C. Cir. 1997). As to this, he is clearly correct.

Although there is abundant evidence that similarly situated male and female arrestees were searched differently at the D.C. Superior Court cellblock during the class period, the inquiry does not end there. "[A] plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 129 S. Ct. at 1948. "Where the claim is invidious discrimination in contravention of the First and Fifth Amendments, our decisions make clear that the plaintiff must plead and prove that the defendant acted with discriminatory purpose." *Id.* (citations omitted).

> Under extant precedent purposeful discrimination requires more than "intent as volition or intent as awareness of consequences." *Personnel Administrator of Mass. v. Feeney*, 442 U.S. 256, 279 (1979). It instead involves a decisionmaker's undertaking a course of action "'because of,' not merely 'in spite of,' [the action's] adverse effects upon an identifiable group." *Ibid.* It follows that, to state a claim based on a violation of a clearly established right, respondent must plead sufficient factual matter to show that petitioners adopted and implemented the detention policies at issue not for a neutral, investigative reason but for the purpose of discriminating on account of [sex].

*Id.* at 1948–49. Thus, the "complaint must at least allege that the defendant federal official was personally involved in the illegal conduct." *Simpkins*, 108 F.3d at 369.[13]

It is on this point that Plaintiffs' claims cannot succeed. There is no allegation or evidence that Marshal Dillard personally conducted any of the challenged strip searches. Further, notwithstanding the plethora of evidence that male and female arrestees were searched according to differing protocols, Plaintiffs fail to point to any colorable evidence that Marshal Dillard purposefully intended this disparity to exist as a way to discriminate against women. Plaintiffs argue that a jury could infer from all the evidence that Marshal Dillard changed the policy during his tenure specifically to require that all female arrestees undergo a strip search while male arrestees were only to be similarly searched upon individualized suspicion; or that even if the official policy were gender neutral, that Marshal Dillard directed—or, at a minimum, was aware of—the unequal search practices. Neither argument is supported by the record and Marshal Dillard's mere knowledge of a disparity in search protocols, even if shown, would not suffice to impose personal liability.

### 1. No Evidence That Marshal Dillard Intended a Discriminatory Policy

No evidence exists that Marshal Dillard implemented a policy which directed a blanket practice of strip searching female arrestees but subjected male arrestees to strip searches only on individualized suspicion. Plaintiffs allege that testimony about meetings between Marshal Dillard and his supervisors to discuss implementing a customized Superior Court search policy could reasonably create an impression with a jury that Marshal Dillard specifically instituted a gendered

---

[13] To the extent Plaintiffs attempted to proceed against Marshal Dillard on a theory of deliberate indifference, *see* Second Am. ¶ 232, the theory must fail. *See Iqbal*, 129 S. Ct. at 1948 ("purposeful discrimination requires more than 'intent as volition or intent as awareness of consequences'") (citation omitted). It appears Plaintiffs have abandoned any deliberate indifference theory of liability. *See* Def.'s Reply at 42 n.16.

policy; Plaintiffs also cite the *Clifton* and *Helton* interrogatory responses as support that such a policy—and not merely an irregular practice—existed.

The meetings in question are brought to light by Michael Mitchell, who worked at the Superior Court from 1998 to 2003 in various capacities, but who admittedly was confused as to the dates of these meetings.[14] Mr. Mitchell mentioned a 1999 meeting with Marshal Dillard and Chief Deputy Charles Rowe, second in command, sometime after issuance of Policy Directive 99-25 by the Service in July 1999. Mr. Mitchell remembers that Marshal Dillard said he wanted every arrestee to be subject to a drop, squat and cough search until a "more customized" approach for the Superior Court—being developed by Chief Rowe—could be implemented in the wake of Policy Directive 99-25. Pls.' Mem., [Attach. 51] Michael Mitchell Dep. (Oct. 7, 2009) at 119–22. At a second meeting, after Mr. Mitchell had become an Assistant Deputy Chief in 2000, Mr. Mitchell remembered that Chief Rowe was about to "put the district policy out" that would prohibit strip searches without individualized suspicion. *Id.* at 123–24, 132–33. Later in his deposition, Mr. Mitchell acknowledged that he was unsure of the dates of the meetings and indicated that the first meeting could have occurred as late as 2003. *Id*. at 128–29, 156–57.

Plaintiffs pounce on the lack of certainty of such dates, and the evidence that men and women arrestees were treated differently, to argue that a jury could find that Marshal Dillard implemented a policy in 1999 or 2000 that prohibited blanket strip searches of male arrestees while requiring it of all female arrestees. However, at no point did Mr. Mitchell testify that the new

_____

[14] Mr. Mitchell came to the Superior Court as the a.m. cellblock supervisor in January 1998, continued in that position until January 1999, was then promoted to Assistant Chief Deputy in 2000, and became a Chief Deputy in September 2003, when he left the Superior Court. For his first year as cellblock supervisor, he testified that the practice was to strip search every male arrestee. Pls.' Mem., [Attach. 51] Michael Mitchell Dep. (Oct. 7, 2009) at 18, 83–86.

Superior Court policy would call for male and female arrestees to be treated differently or that Marshal Dillard ordered, or ever mentioned, such a difference in treatment. No matter how confused the testimony about dates, there is no testimony that Marshal Dillard contemplated a policy of gender discrimination against women by search practices.[15]

Similarly, while the sworn answers to interrogatories in *Clifton* and *Helton*, signed by supervisory Deputy Mark Shealey, indicate a clear differentiation in treatment of male and female arrestees, there is no evidence tying Marshal Dillard to this difference, much less that he ordered it. In fact, Marshal Dillard testified that he neither read nor wrote the interrogatory responses. Dillard Dep. at 119, 144. Further, Mr. Shealey, in the sworn answers, identified Policy Directive 99-25 as the governing policy in 2000 and 2001, thus refuting Plaintiffs' argument that some unaccounted for, discriminatory policy had been put in place. While still agreeing with the factual premise of the interrogatory responses that only female arrestees were subject to a blanket practice of drop, squat and cough searches, Mr. Shealey testified at deposition in this case that he did not know why the practice was to strip search female arrestees, but not male arrestees, and that he just assumed it was because females could hide contraband in their vaginas. Shealey Dep. at 158–162. Further, he testified that no one had ever directed him to treat the genders differently. *Id.* at 160, 163–68. Neither of these bits of evidence carries Plaintiffs' burden to show that Marshal Dillard purposefully discriminated against women arrestees through a Superior Court policy.

---

[15] Plaintiffs express great skepticism that the search practices could be as disparate as the interrogatory answers and discovery indicate without the intention and/or knowledge of Marshal Dillard. The Marshal's testimony about his and his supervisors' attention to cellblock issues supports such skepticism, especially when contrasted with Marshal Dillard's frequent memory lapses at deposition. However, the beginning of the time period in question is more than a decade ago and Marshal Dillard has long since retired. Given the legal standards applicable to Plaintiffs' claims, their skepticism is insufficient to push this matter to a jury.

## 2. No Evidence Marshal Dillard Directed a Discriminatory Practice

There is no colorable evidence in the record that Marshal Dillard knew of the practice of searching the sexes differently, let alone that such a practice was directed by him. Plaintiffs argue it is incredible to believe Marshal Dillard did not know of the disparate search practices given the prolific nature of these practices—which may have existed for years—and that Marshal Dillard had supervisors who were supposed to be reporting to him on failures of Superior Court personnel to follow his policies. The argument fails to carry the point. Marshal Dillard's mere knowledge of, or acquiescence in, his subordinates' potentially discriminatory practices would not constitute purposeful discrimination on his part. *See Iqbal*, 129 S. Ct. at 1949 (rejecting argument that superiors may be liable for their "knowledge and acquiescence in their subordinates' use of discriminatory criteria to make classification decisions among detainees").

Marshal Dillard's recollection was hazy but he testified to observing male arrestees being strip searched on those occasions that he inspected male search rooms. Dillard Dep. at 76. Plaintiffs contend that Marshal Dillard must have observed and implicitly approved a different search policy for male arrestees than for women since he says he observed strip searches in the male search room but other deposition testimony indicates a lack of a blanket policy on strip searching male arrestees. According to Plaintiffs, this varying testimony "creates an inference that defendant Dillard knew about the search practices and approved them." Pls.' Opp'n [Dkt. # 243] at 15. However, both deputies and DEOs testified that they rarely, if ever, saw Marshal Dillard in the cellblock or had any contact with him, *see, e.g.,* Def.'s Mem., [Attach. 6] Suppl. Interrogatory Responses, Answers to Question # 5; Shealey Dep. at 284 (testifying that he only recalled seeing Marshal Dillard in the cellblock on September 11, 2001); Stover Dep. at 61, 91 ("I can't recall

[whether Marshal Dillard ever observed any strip searches]. Marshal [Dillard] hardly ever came to the cell block"), and the Marshal's testimony alone does not carry the inference Plaintiffs seek, even if an inference alone satisfied Plaintiffs' burden.

To be sure, Marshal Dillard proclaimed that it was his job as a supervisor to ensure his policies were being followed, that his supervisors should have known if there were any deviation from these policies, and that any such deviation would have been discussed at weekly supervisors' meetings. *See* Dillard Dep. at 68, 73. Marshal Dillard insists that he would have "relieved [a supervisory deputy] immediately, if not sooner," *id.* at 197, if he had heard that he told a cellblock DEO or deputy not to subject male prisoners to a blanket drop, squat and cough search. These protestations notwithstanding, Plaintiffs have no evidence that Marshal Dillard actually knew that his alleged search policy was not being evenly enforced, let alone any evidence that Marshal Dillard intended or directed such disparity as a way to purposefully discriminate against women arrestees.[16]

---

[16] The record suggests many reasons why practices may have varied, not least of which appears to have been a singular lack of direction or oversight by those in command. *See, e.g.,* Mitchell Dep. at 71–74, 87–88 (explaining that when he began at the Superior Court he was never instructed by Marshal Dillard or Chief Rowe how searches were to be conducted, but simply copied the practices of those around him); Bolls Dep. at 32, 39–42, 60, 62–63 (testifying that as cellblock supervisor he never had any conversations or instructions, nor was aware of written policies, on how to search arrestees, nor was this topic broached at any supervisors' meetings he attended); Pls.' Mem., [Attach. 20] Thomas Hedgepeth Dep. (July 18, 2007) at 82 (expressing that Marshal Dillard was a hands-off manager); Hedgepeth Dep. (7/17/07) at 225–27 (acknowledging that cellblock personnel did not like strip searching male arrestees and avoided doing so); Stover Dep. at 58 (noting that when supervisors were not around, he and other DEOs or deputies would often stop blanket strip searches of male arrestees because of their dislike of the practice); *id.* at 99 ("It's not something that, you know, I wanted to do. I didn't think it made any sense, personally."); Brandt Dep. at 69 (explaining that neither he nor his fellow DEOs or deputies would conduct blanket strip searches of male arrestees because "I expressed my opinion that it wasn't an appropriate search and they did not do the searches when I was there. . . I didn't say, 'Don't you do it' [to the other men]. I said, 'I don't think it's a good practice,' and my recollection is people that were there with me agreed and performed regular in-custody searches."); Def.'s Dep. Excerpts II [Dkt. # 248], [Attach. 20] Carl Eugene Teeter Dep. (July 23, 2008) at 87–88, 124 (noting that male arrestees not all strip searched

Plaintiffs argue that all the contested evidence makes it totally incredible that Marshal Dillard did not at least know of the disparities in search practices, and that credibility is an issue for a jury to decide. *See Jones v. Bernanke*, 557 F.3d 670, 681 (D.C. Cir. 2009). Marshal Dillard defends on the basis that "no one has testified that Marshal Dillard instructed them to search males and females differently, and no one who admits [to strip searching women but not men] . . . claims to have even informed Marshal Dillard of that practice." Def.'s Reply [Dkt. # 250] at 16. The defense amounts to "ignorance is bliss," which is usually insufficient to avoid a jury trial. But when it comes to holding a federal employee, acting within the scope of his employment, personally liable for a violation of the Fifth Amendment's right to equal protection, a plaintiff must show purposeful and personal action to discriminate (in this case on gender). As a result, it would not be dispositive even if Marshal Dillard knew of the discriminatory search practices (which is not shown). Mere knowledge of or deliberate indifference to unequal treatment is not enough and despite the voluminous record created in this litigation, there is no circumstantial or direct evidence that Marshal Dillard purposefully directed that women and men be searched differently at the Superior Court cellblock.

Summary judgment is properly granted against a party who "after adequate time for discovery and upon motion . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. Marshal Dillard is entitled to summary judgment on Plaintiffs' Fifth

---

because of sheer numbers involved); Shealey Dep. at 166–67 (explaining that the ratio of men to women processed into the cellblock was approximately 4 to 1, so it was impractical to strip search every male arrestee: "If the numbers [of DEOs/deputies to arrestees] were equal, and the manpower and the time restraints were enough where we could strip everybody, we'd strip everybody").

Amendment claims.

## IV.  CONCLUSION

For the reasons stated above, Plaintiffs Donna Curtis, Dianne Johnson, and Carolyn Montgomery will be dismissed without prejudice.  Summary judgment will be denied to Plaintiffs on their Fourth Amendment claims and granted to Marshal Dillard on the Fourth and Fifth Amendment claims.  Marshal Dillard's Motion for Order to Decertify Class, *see* [Dkt. # 258], will be denied as moot.  Accordingly, this case will be dismissed.  A memorializing Order accompanies this Memorandum Opinion.

Dated: April 21, 2011                                            _____/s/_____
                                                                                ROSEMARY M. COLLYER
                                                                                United States District Judge